## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Task Force Officer Kevin Rutina, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      The following affidavit is furnished to support a search warrant for the following: (1) the third-floor loft of the residence located at 535 Granite Street, Manchester, New Hampshire ("Granite Street Third Floor") described in more detail in Attachments A. The first-floor apartment of 535 Granite Street will be referred to as the "Granite Street Residence" throughout this affidavit.

2.      Based on the facts and circumstances set forth in this affidavit, I submit that there is probable cause to believe that Chrystal Callaghan ("Chrystal"), Jovan Callaghan ("Jovan") and Melissa Gazaway ("Gazaway") are engaged in narcotics trafficking activities that constitute violations of 21 U.S.C. § 846 (conspiracy to distribute controlled substances) and 21 U.S.C. § 841(a)(1) (distribution of controlled substances), and that evidence of those offenses will be found in the places to be searched.

3.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.  I also am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

1

4.      I am a Trooper First Class with the New Hampshire State Police Narcotics Investigations Unit assigned as a Drug Enforcement Administration ("DEA") Task Force Officer with the Southern New Hampshire DEA High Intensity Drug Trafficking Area Task Force in the Manchester District Office and have been so assigned since March of 2019. I have been employed by the New Hampshire State Police since February of 2008. My duties and responsibilities include the investigation of federal crimes, including violations of 21 U.S.C. §§ 841(a)(1) and 846. I have participated in numerous investigations relating to the distribution of controlled substances, including cocaine, heroin, fentanyl, and other substances. I have received significant training in the field of narcotics enforcement and investigations. Through my training, education, and experience, I have become familiar with the manner in which drug distribution organizations conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement.[1]  In the course of participating in investigations of drug distribution organizations, I have conducted or participated in surveillance, the purchase of illegal drugs, the execution of search warrants, debriefings of subjects, witnesses, and confidential informants, and reviews of consensually recorded conversations and meetings, and Title III intercepts.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. In

---

[1] Observations made and conclusions drawn throughout this affidavit that are based on my training and experience also include the training and experience of other law enforcement agents and officers with whom I have discussed these issues.

preparing this affidavit, I have prepared reports and reviewed reports prepared by other investigators of witness interviews, surveillance, and other investigative efforts regarding this investigation. In addition, I have discussed this investigation with other officers involved in the case. Through these conversations and my own analysis of these reports, I am familiar with all aspects of this investigation. The information contained in this affidavit is submitted for the sole purpose of supplying probable cause for the issuance of search warrants. This affidavit does not set forth all of my knowledge about this investigation.

## **PROBABLE CAUSE**

6.       Since March 2020, the DEA, New Hampshire State Police Narcotics Investigation Unit, and Manchester Police Department Special Investigations Unit have been conducting an investigation of drug traffickers operating from Manchester, New Hampshire, who sell fentanyl and cocaine base, commonly known as crack cocaine. Beginning around that time, officers began conducting surveillance outside the Granite Street Residence and made observations consistent with drug customers coming and going from the residence. They also received information from a confidential source ("CS #1") [2] that Chrystal and Jovan had been selling drugs out of the

---

[2] CS #1 is not working off any pending criminal charges and is being paid by law enforcement for cooperation. The CS has been convicted of counterfeiting in 2009, for which it received a sentence of probation and had to pay restitution, burglary in 2010, and conduct after an accident in 2019. The CS has previously cooperated with the New Hampshire State Police in another investigation and its information was found to be reliable. The CS later conducted controlled buys with its significant other (CS #2) who was also working solely for payment. CS #2 has convictions for possession of stolen motor vehicle in 1995, B&E nighttime in 1995, burglary in 2012, theft by unauthorized taking in 2012, criminal mischief 2010, burglary inchoate in 2018, criminal trespass in 2018, drive after revocation or suspension in 2018, DV simple assault in 2017, and simple assault in 2017. The DEA and NHSP have paid the informants approximately $400 for their work in the case.

residence for years and that Chrystal frequently made trips to New York to meet with her source of supply for drugs.[3]

7.     On May 4, 2020, CS #1 gave officers information that Chrystal would be traveling to New York to pick up from her source of supply and NHSP NIU conducted surveillance. They watched Chrystal's vehicle leave the Granite Street Residence and followed her into Connecticut where they lost her on the highway, nevertheless corroborating the CS's information.

8.     On May 17, 2020, officers were called to the Granite Street Residence for a report of a firearm being brandished during an altercation on the street. According to witnesses, a juvenile living with Chrystal got in a fight with a man about a dog and brandished an airsoft pistol. A bystander then captured a video of Chrystal coming out of the residence and pointing what appeared to be a gun at the victim. The events led officers to apply for a state search warrant for the Granite Street Residence. While executing the warrant, they observed in plain view white powder believed to be heroin/fentanyl, over $17,000 in U.S. currency, digital scales, and airsoft pistols. Chrystal has pending charges for criminal threatening based on the incident.

9.     On various occasions during the Spring of 2020, officers received information that Chrystal's car apparently made quick trips to the New York area. On June 8, 2020, officers

---

[3] On August 5, 2019, a Westchester, New York, police officer conducted a lawful traffic stop of a vehicle driven by Chrystal with Gazaway as the passenger as it was traveling northbound on the Hutchinson River Parkway. The officer had observed their vehicle travel southbound a few hours earlier and confirmed their recent travel in that direction. Chrystal and Gazaway lied to the officer about their travel and his observations of a hypodermic needle and marijuana in the vehicle led him to call a narcotics canine who alerted to the car. Officers searched the vehicle and found what lab results have confirmed to be approximately 100 grams of suspected cocaine base and a relatively small amount of alprazolam pills hidden in a cereal box. Both women denied knowledge of the drugs. The police reports list the Granite Street Residence as the residence for both women.

conducted a traffic stop of Chrystal on her way back to New Hampshire (having conducted physical surveillance of her all the way from Connecticut to New Hampshire). After observing a traffic violation, Trooper Locke stopped the car and identified Gazaway as the driver, Chrystal as the passenger, and Chrystal's minor child in the back seat. Both Gazaway and Chrystal lied and said they were coming from Nashua and the trooper observed a small bag of marijuana in the back seat with the child. The trooper's narcotics canine then alerted to the vehicle and officers searched it at the side of the road. Chrystal and Gazaway eventually admitted on scene that they had traveled to New York where they purchased approximately 100 grams of crack cocaine for $5,000. Chrystal removed the drugs from her bra and provided them to officers. She said that she sold the crack in Manchester for $80 per gram and agreed to cooperate further. Chrystal was taken to the barracks where she was read her *Miranda* rights. After reviewing them, she asked for a lawyer and officers stopped questioning her.

*Controlled Purchases from the Granite Street Residence (CS #1 & CS #2)*

10.     Beginning in September 2020, CS #1 and CS #2 (together "the CSs") began conducting controlled purchases of fentanyl and crack cocaine from Chrystal and Jovan at the Granite Street Residence. According to the CSs, Chrystal sells crack and Jovan sells heroin/fentanyl and they have independent customer bases and sources of supply but sell for each other whenever one is not available. During all controlled purchases discussed in this affidavit, officers met with the CSs before and after the purchase at which time they searched them for contraband and unexplained currency with negative results. The CSs were kept under close law enforcement surveillance and met with officers after the purchase to turn over the drugs. Some controlled purchases were recorded and all were overheard by officers on a transmitter in real time.

11.     On September 4, 2020, the CSs placed a call to Chrystal at 603-858-5209, and asked if they could purchase a quantity of crack cocaine and fentanyl. Chrystal agreed and told them to "just come by." The CSs entered the Granite Street Residence and purchased what lab results confirmed to be approximately 4.87 grams of fentanyl and .95 grams of crack cocaine. According to the CSs, when they arrived, Chrystal left the residence and ran upstairs, returning with a backpack. The CS observed at least 20 fingers of fentanyl (approximately 200 grams) and approximately a kilogram of crack cocaine packaged in small bags for distribution in the backpack. She took drugs out of the backpack and sold them to the CSs.

12.     On September 15, 2020, the CSs sent a text message to Chrystal. The message went unanswered but as the CSs were previously told by Chrystal to "just come by," investigators decided to send the CSs to the Granite Street Residence. The CSs entered and met with Jovan who confirmed that there was always someone there to serve them if they just came by. Jovan had the drugs in the residence and the CSs purchased what lab results confirmed to be 5.05 grams of fentanyl and tramadol, and .92 grams of cocaine base from Jovan.

13.     On October 2, 2020, the CSs called Chrystal on 603-858-5209 who told them to come by in "ten minutes." The CSs traveled to the Granite Street Residence and once inside, they observed Chrystal with a case containing fingers of fentanyl and large amounts of crack cocaine. She sold them what lab results confirmed to contain approximately 5.2 grams of fentanyl and 1.02 grams of cocaine base.

14.     On November 4, 2020, the CSs conducted another controlled purchase from Jovan at the Granite Street Residence. When the CSs arrived, Jovan left the residence, walked upstairs, and returned with a tan backpack containing a case with apparent fentanyl and crack cocaine in it. The CSs purchased approximately 5 grams of fentanyl and 1 gram of crack cocaine.

Lab results have not been received. While there, the CS observed another customer purchase approximately 10 fingers (100 grams) of suspected fentanyl. Additionally, on this date, Jovan told the CSs that Chrystal may soon be moving.

*The Red Dart*

15.     On November 9, 2020, a federal warrant collecting GPS location data from Chrystal's phone, 603-858-5209, showed her traveling from New Hampshire to New York, stopping in New York for a short time, and returning northbound. A NHSP Trooper stopped the DART before it got to Manchester and identified Gazaway as the driver, Chrystal as the passenger, and Chrystal's minor daughter in the backset. The women gave conflicting stories about their whereabouts and Chrystal eventually gave written consent to search the vehicle. The officer found approximately 130 grams of crack cocaine in the arm rest in the rear of the vehicle. Lab results have not been received. Officers conducting surveillance have regularly observed the Red Dart outside the Granite Street Residence since that time and despite Jovan's statement, believe that Chrystal still resides at the Granite Street Residence.

*Controlled Purchases with Additional CSs*

16.     The Nashua Police Department identified a confidential source ("CS #3") who said that he/she purchased fentanyl from Gazaway.[4] On or about December 8, 2020, the Nashua Police Department used CS #3 to conduct a controlled purchase of drugs from Gazaway by

---

[4] CS #3 is cooperating in hopes of receiving favorable treatment for pending drug charges, possession of fentanyl. CS #3 has convictions for criminal mischief in 2009, simple assault in 2009, issuing bad checks in 2004, felon in possession of dangerous weapon in 2010, violation of terms of probation or parole in 2009,theft by unauthorized taking in 2008, criminal threatening in 2006, fugitive from justice in 2004, shoplifting in 2004, reckless conduct in 2003, sale of controlled drug in 2003, disorderly conduct in 2018, driving after revocation in 2008, driving under the influence of drugs or liquor in 2010, and resist arrest or detention in 2012,

calling (603) 351-1972. Gazaway delivered approximately 20 grams of fentanyl to the CS's residence in Nashua and returned directly to the Granite Street Residence after the sale. The drugs field tested positive for fentanyl but lab results have not yet been received.

17.     On December 15, 2020, the Manchester Police Department met with another confidential source ("CS #4") who said he/she could purchase from Jovan, Chrystal, and Gazaway interchangeably.[5] On that date, CS #4 called Jovan at (603) 351-1972, the same number CS #3 used to contact Gazaway, and placed an order for fentanyl and crack cocaine. CS #4 spoke with Jovan but heard Gazaway's voice in the background. CS #4 said that even though he/she places orders with Jovan, Gazaway frequently acts as his runner. CS #4 traveled to the Granite Street Residence where Gazaway was waiting for the CS outside. The CS and Gazaway walked into the common hallway of the Granite Street Residence where Gazaway handed the CS approximately 5 grams of fentanyl and 1 gram of crack cocaine. Lab results have not been received.

*The Third Floor Loft*

---

[5] CS #4 is cooperating in hopes of receiving favorable treatment for pending drug charges. CS #4 has convictions for disobeying an officer in 2017, violation of probation or parole in 2017, operate after being certified as habitual offender in 2017, forgery in 2014, violation of probation or parole in 2014, receiving stolen property in 2013 and 2014, theft by unauthorized taking in 2013, disobeying an officer in 2013 and 2014, resist arrest or detention in 2009, hindering apprehension/prosecution in 2010 and 2011, shoplifting in 2009, driving after revocation or suspension in 2014, credit card fraud in 2014, burglary in 2013, willful concealment in 2017, theft by unauthorized taking in 2017, and theft by deception in 2019. On the morning of December 21, 2020, police watching the Granite Street Residence observed CS #4 drop off a person they believed to be Jovan in the early morning hours. This initially concerned officers if CS #4 was contacting Jovan without telling them. CS #4, however, independently called officers later that day to report that he/she had been at Dunkin Donuts and had seen Chrystal's nephew who needed a ride to the Granite Street Residence. He/she said that he/she gave the nephew a ride and that the male officers saw was not in fact Jovan. Officers did not get a clear enough view to confirm whether or not the male was Jovan and believe that CS #4's report was truthful.

18.    On or about December 21, 2020, a Grand Jury in the District of New Hampshire returned an indictment charging Gazaway, Jovan, and Chrystal with conspiracy to distribute and possess with intent to distribute controlled substances. The Court issued arrest warrants for all three. On or about December 22, 2020, United States Magistrate Judge Andrea K. Johnstone signed a warrant to search the Granite Street Residence (first floor apartment and any common areas). *See* 20-mj-231-01-AJ (incorporated by reference). On the morning of December 23, 2020, law enforcement officers responded to the Granite Street Residence to execute the arrest and search warrants. Officers found Jovan and Chrystal in the first-floor apartment and arrested them. They began a sweep of the common areas of the residence. At the top of the second-floor stairway, they encountered an open door leading up to a third floor and entered to conduct a safety sweep. On the third floor, through that open door, they found a loft with a bed that was apparently used as an apartment but no one was there.

19.    While conducting the sweep, in plain view, officers observed on a table two small plastic baggies with white powder and surfaces on the table with white powder. Through my training and experience, I know that this white powder is consistent with drug residue and plastic baggies are consistent with how drugs are frequently packaged.

20.    According to a Manchester Police report, on March 9, 2019, patrol officers responded to 535 Granite street for a panic alarm. Officers checked the building and one officer went up to the third-floor stairway and knocked on the door which was closed at that time. Eventually a male came to the door to speak with officers. Officers also identified Gazaway in the residence. Gazaway identified herself as the lessee of the apartment and referred to it as apartment 3, although there was no apartment number on the door.

21.     As officers observed apparent drugs in the apartment, as it has historically been affiliated with Gazaway and as on numerous occasions, Jovan and Chrystal appeared to go upstairs to retrieve drugs, I seek authority to search this third-floor loft for evidence of drug trafficking.

Training and Experience Concerning Items to be Seized

22.     Based upon my training and experience, as well as the collective knowledge and experience of other agents and police officers in my office, I am aware that drug traffickers very often store controlled substances, firearms, and other tools of the drug trade in their homes, automobiles, garages or outbuildings on their properties, basements, or other places under their immediate control. I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia including, but not limited to, scales, plastic baggies, wrapping material, paper or plastic bundles, and zip lock bags, in residences or other locations they access with frequency. Based on my training and experience, powder drugs such as fentanyl are generally brought into the region in bulk. However, such drugs are not typically consumed by users in such high purity form. Rather, such powder drugs, when ultimately consumed by the user, are at a lower purity level. High purity powder drugs are reduced in purity by the addition of dilutants. This process is called "cutting" or "stepping on" the drug. Other equipment, such as scales, grinders, razor blades, glass panes, blenders, and mirrors, and the like are typically used in this cutting process. Once the drug has been "cut," a usual practice is to repackage it in smaller quantities in heat-sealed and/or other types of plastic bags for redistribution.

23.     It is generally a common practice for drug traffickers to maintain in hard copy or on other electronic devices, records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.

24.     Drug traffickers will commonly maintain records and documents which provide a paper trail for money laundering of illicit drug trafficking proceeds, often long after the actual transactions. There are many reasons why an individual will generally maintain records for long periods of time. One reason is that the records will often seem innocuous because of their nature (e.g. financial, credit card and banking documents, travel documents, receipts, client lists, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes, packaging materials, computer hardware and software). Second, the individual may no longer realize he/she still possesses the records or may believe law enforcement could not obtain a search warrant to seize the evidence. Lastly, it is common for individuals to set aside or store such records, and because they generally have no immediate need for the records, they are often forgotten. To law enforcement, however, all these items may have significance and relevance when considered in light of other evidence.

25.     Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. Drug traffickers may also keep lists of customers, the cars they drive, and the phones they use in order to keep track of them. They may also collect court papers and other documents about customers who they believe may be cooperating with law enforcement authorities in order to protect themselves or attempt to intimidate potential cooperators.

26.     It is also a generally common practice for traffickers to conceal at their residences or other places they access frequently large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. Individuals who distribute controlled substances often use cash or readily transported assets which are used as cash equivalents like pre-paid debit cards, gift cards, bearer bonds, gold, diamonds, or jewels because of the illegal nature of the transactions and to lessen the possibility of a financial paper trail. Additionally, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. They may also use banks and wire companies, both foreign or domestic, to launder and transfer funds to co-conspirators. They may also use shipping companies and keep records of shipments of goods bought with drug proceeds. Records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences. I know that drug traffickers sometimes purchase real estate with suspected drug proceeds. They may keep records of real estate transactions, money received from rental properties, and other such documents in their residences. CS #1 have known Chrystal and Jovan to be in the drug business for years.

12

Therefore, I believe that financial documents dating back to 2017, may provide evidence of drug trafficking and sources of income.

27.    Based on my training and experience, I know that individuals involved in the distribution of controlled substances attempt to hide the true identity of their residence and, further, employ methods of surveillance at such residence in order to evade law enforcement. Typically, these individuals will maintain at their residence documents relating to the identity of the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. I know that drug traffickers often use storage units to store drug proceeds and that keys or records of these units may be kept in residences.

28.    Typically, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs. Chrystal previously kept airsoft guns in her residence.

29.    Based on my training and experience, I know that drug traffickers typically use cellular telephones in order to facilitate drug transactions, including to order and take orders for controlled substances or to set up shipments. I am aware that items such as cell phones and US currency are often located in a residence or on an individual's person.

30.     Individuals involved in the illicit distribution of controlled substances often take or cause to be taken photographs of themselves, their associates, their property and their product and such items are usually maintained within their residence and sometimes on cell phones.

31.     It is common for individuals who are involved in the trafficking and distribution of controlled substances to store the records of those activities and proceeds of those activities in secure areas over which they have control such as safes, bags, locked drawers, briefcases, and duffel bags, among other locked containers.

<u>Training and Experience on Digital Devices</u>

32.     In addition to documentary evidence of financial and drug trafficking crimes, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and many of these cellular telephones are kept at drug stash houses or at the dealers' own residences.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. I am aware that collections of cell phones have been found during drug trafficking search warrants of stash houses or residences that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

33.     As noted above, evidence of drug crimes can be found in the cell phones
and smart phones referenced in the preceding paragraphs.  Such evidence can include
internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well
as incriminating communications via emails, text messages or instant messages.  Actions
such as internet searching or emailing (in addition to calling) and text messaging can now
be performed from most cell phones. I know, based on my training and experience, that
drug traffickers may use encrypted chat platforms like Whatsapp, Textnow, Facebook
Messenger, and Instagram, to communicate with people in other countries (often
countries from where drugs are brought into the United States) and with people who are
most cautious about law enforcement detection. Other applications like Venmo or
Cashapp allow people to quickly make financial transfers to others and drug customers
may use these methods to pay their sources of supply for drugs.

34.     In addition, those involved in drug trafficking crimes commonly
communicate using multiple cellular telephones.  Contemporaneous possession of
multiple cellular telephones is, therefore, evidence of drug trafficking.  Moreover, the
particular numbers of and the particular numbers dialed by particular cellular telephones
can be evidence of drug trafficking. Such numbers can confirm identities of particular
speakers and the occurrence of certain events. Based on my training, experience, and
information provided by other law enforcement officers, I know that many smartphones
can now function essentially as small computers. Smartphones have capabilities that
include serving as a wireless telephone, digital camera, portable media player, GPS
navigation device, sending and receiving text messages and e-mails, and storing a vast
range and amount of electronic data.  Examining data stored on devices of this type can

uncover, among other things, evidence that reveals or suggests who possessed or used the device.

35.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device.   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a

law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.   The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.  Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an

17

active file or that is unused after a file has been allocated to a set block of

storage space, for long periods of time before they are overwritten.  In

addition, a computer's operating system may also keep a record of deleted

data in a swap or recovery file.  Similarly, files that have been viewed on

the Internet are often automatically downloaded into a temporary directory

or cache.  The browser typically maintains a fixed amount of hard drive

space devoted to these files, and the files are only overwritten as they are

replaced with more recently downloaded or viewed content.  Thus, the

ability to retrieve residue of an electronic file from a hard drive depends

less on when the file was downloaded or viewed than on a particular user's

operating system, storage capacity, and computer habits.  Recovery of

residue of electronic files from a hard drive requires specialized tools and

a controlled laboratory environment.  Recovery also can require

substantial time.

e. Although some of the records called for by this warrant might be found in

the form of user-generated documents (such as word processing, picture,

and movie files), digital devices can contain other forms of electronic

evidence as well.  In particular, records of how a digital device has been

used, what it has been used for, who has used it, and who has been

responsible for creating or maintaining records, documents, programs,

applications and materials contained on the digital devices are, as

described further in the attachments, called for by this warrant.  Those

records will not always be found in digital data that is neatly segregable

18

from the hard drive image as a whole.  Digital data on the hard drive not

currently associated with any file can provide evidence of a file that was

once on the hard drive but has since been deleted or edited, or of a deleted

portion of a file (such as a paragraph that has been deleted from a word

processing file).  Virtual memory paging systems can leave digital data on

the hard drive that show what tasks and processes on the computer were

recently used.  Web browsers, e-mail programs, and chat programs often

store configuration data on the hard drive that can reveal information such

as online nicknames and passwords.  Operating systems can record

additional data, such as the attachment of peripherals, the attachment of

USB flash storage devices, and the times the computer was in use.

Computer file systems can record data about the dates files were created

and the sequence in which they were created.  This data can be evidence

of a crime, indicate the identity of the user of the digital device, or point

toward the existence of evidence in other locations.  Recovery of this data

requires specialized tools and a controlled laboratory environment, and

also can require substantial time.

f.   Further, evidence of how a digital device has been used, what it has been

used for, and who has used it, may be the absence of particular data on a

digital device.  For example, to rebut a claim that the owner of a digital

device was not responsible for a particular use because the device was

being controlled remotely by malicious software, it may be necessary to

show that malicious software that allows someone else to control the

19

digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device.  Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

<u>Conclusion</u>

36.     For all the reasons described above, I submit that there is probable cause

to believe that evidence and fruits of the violations of Title 21, United States Code,

Sections 841(a)(1) and 846 will be found by searching the locations described in

Attachment A. Based upon my training and experience I believe that the items set forth in

Attachment B are commonly possessed by drug traffickers in their homes, on their cell

phones, or in other places under their control and that those items are evidence of

violations of the offenses being committed by Chrystal, Jovan, Gazaway, and others.


        Dated: December 23, 2020          /s/ Kevin Rutina_____
                                          Kevin Rutina
                                          Task Force Officer
                                          U.S. Drug Enforcement Administration


The affiant appeared before me by telephonic conference on this date pursuant to Fed. R.
Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.


_____
Hon. Andrea K. Johnstone
United States Magistrate Judge
District of New Hampshire

Dated: December 23, 2020

21

## <u>ATTACHMENT A</u>

### 535 Granite Street, Third Floor Loft, Manchester, New Hampshire

This search warrant authorizes the search of the premises located on the third floor at 535 Granite Street, in Manchester, New Hampshire, including all safes, containers, and enclosures therein. The premises located at 535 Granite Street is a white two-unit residence (first and second floor) with a chain link fence. The apartment also contains a third-floor loft that has apparently been converted to an apartment. The third-floor loft is accessed from the internal common stairway. The residence is labeled with "535" by the front door.

 

## ATTACHMENT B
## Granite Street Residence – Third Floor Loft

1.  Controlled substances including, but not limited to crack cocaine and fentanyl;

2.  Drug distribution paraphernalia including, but not limited to: scales, plastic baggies, wrapping material, paper or plastic bundles, blenders, zip lock bags, presses, cutting agents, and pill presses;

3.  Devices used to communicate with other drug traffickers or buyers including cellular telephones and pagers believed to be used by Chrystal Callaghan, Jovan Callaghan, Gazaway, or co-conspirators and electronic equipment used for counter-surveillance such as scanners, police radios or monitors;

4.  Documents associated with drug trafficking including pay-owe sheets, buyer lists, seller lists, ledgers, records of sales, records of expenditures made to purchase drugs or chemicals and apparatus used to manufacture drugs, buyer lists, telephone lists, and address books;

5.  Large amounts of currency (exceeding $500) or readily transported assets which are used as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds, precious jewels, etc.); prepaid debit cards and gift cards;

6.  Materials evidencing expenditure of drug trafficking proceeds including, purchase of large assets, including digital image storage devices, records of real estate or securities transactions, escrow files, wire transfer records, automobiles, motorcycles, trucks, or other vehicles purchased with cash or cash equivalents; credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

7.  Photographs, negatives, video tapes, films, depicting the subjects of the investigation and their criminal associates, (showing association with the associates, depicting their assets or depicting controlled dangerous substances);

8.  Personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, correspondences of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

9.  Weapons to include handguns, ammunition, rifles, shotguns, hand crafted guns, explosive devices, etc., in which there is no immediate appearance of legitimate use and of which may be used in conjunction with the distribution of controlled substances;

10.   Indicia of possession of the place to be searched: including articles of personal property, such as personal identification, immigration documents, personal correspondence, delivery pouches, diaries, checkbooks, notes, photographs, keys, utility bills, receipts, personal telephone and address books, and video tapes, tending to establish the identity of the person or persons in control of the areas to be searched;

11.   Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes and work papers concerning Chrystal, Jovan, or Gazaway, business entities in which they are stakeholders, or co-conspirators; and

12.   Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, safe deposit boxes, conveyances and/or other residences.

13.   For the cellular telephone assigned call number 603-351-1972 used primarily by Jovan Callaghan and/or Melissa Gazaway, I seek to search the telephone for:

   a.   Information associated with drug trafficking, including pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, records of expenditures made to purchase controlled substances, and records of expenditures to purchase products which are used in the distribution of controlled substances;

   b.   lists of customers and related identifying information;

   c.   types, amounts, and prices of controlled substances trafficked as well as dates, places, and amounts of specific transactions;

   d.   any information related to sources of controlled substances (including names, addresses, phone numbers, or any other identifying information);

   e.   any information involving the travel to obtain controlled substances or the transportation of controlled substances;

   f.   information reflecting contact or communication with coconspirators, the distribution of controlled substances to coconspirators, and the disposition of proceeds of controlled substances (including within messaging applications like WhatsApp, Snapchat, and Instagram stored on the phone);

   g.   all bank records, checks, credit card bills, account information, and other financial records (including on financial applications like CashApp and Venmo);

   h.   Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted,

such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.